**Nos. 21-35030, 21-35035**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**
_____

SAFARI CLUB INTERNATIONAL and STATE OF ALASKA,

*Plaintiffs-Appellants,*

v.

DEBRA HAALAND, in her official capacity as Secretary of the
Department of the Interior, et al.,

*Defendants-Appellees.*

and

ALASKA WILDLIFE ALLIANCE, et al.

*Intervenor-Defendants-Appellees.*

On Appeal from the U.S. District Court
for the District of Alaska, Anchorage
Nos. 3:17-cv-00013-SLG and 3:17-cv-00014-SLG
Hon. Sharon L. Gleason
_____

**APPELLANT STATE OF ALASKA'S
OPENING BRIEF**
_____

Jessica M. Alloway
Assistant Attorney General
Department of Law
1031 West Fourth Ave, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5275
Facsimile: (907) 276-3697
jessie.alloway@alaska.gov
*Attorney for Appellant*
STATE OF ALASKA

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................vi

INTRODUCTION ........................................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 3

STATUTORY AUTHORITIES ........................................................... 4

ISSUES PRESENTED ...................................................................... 3

STATEMENT OF THE CASE ............................................................ 6

I.    The State's Management of Alaska's Wildlife ............................. 6

II.   The State's Management Authority Over Fish and Wildlife Within The Kenai National Wildlife Refuge ................................................. 9

III.  Management of the Kenai National Wildlife Refuge.................... 16

IV.  The Board allows hunting brown bears over bait and opens the Skilak WRA to additional hunting ...................................................... 20

     A.    The State's management of the Kenai brown bear population and the Board's decision to allow additional hunting ................................... 20

     B.    The Board's decision to allow additional hunting within the Skilak WRA. ............................................................................. 22

V.   The Service takes action to undermine the State's management authority ... 23

     A.    The Service promulgates a regulation to codify the closure and clarify its bear baiting regulation ................................................. 25

     B.    Congress rejects the Service's attempt to ban brown bear baiting in Alaska refuges .............................................................. 29

VI.  The State files suit, and the district court grants summary judgment in favor of the Service. ....................................................................... 31

SUMMARY OF THE ARGUMENT ................................................... 36

STANDARD OF REVIEW ............................................................... 38

i

ARGUMENT ................................................................................ 39

I.    The Service exceeded its authority under ANILCA by prohibiting hunting that it considered to be "predator control." ................................. 39

II.    The Kenai Rule violates Congress's 2017 amendments to ANILCA ........... 46

III.   The Service acted arbitrarily and capriciously when it banned brown bear baiting although it allowed black bear baiting. ........................... 48

IV.   The Service failed to comply with the procedural requirements of NEPA in enacting the brown bear baiting portion of the Kenai Rule ......................... 51

     A.    NEPA applies to the brown bear baiting provision. ........................... 51

     B.    The Service failed to adequately explain its reasons for applying a categorical exclusion ....................................................... 53

CONCLUSION ........................................................................... 55

STATEMENT OF RELATED CASES ................................................. 57

CERTIFICATE OF COMPLIANCE ................................................... 58

CERTIFICATE OF SERVICE .......................................................... 59

ADDENDUM ............................................................................. 60

# TABLE OF AUTHORITIES

**Cases**                                                                             **Page**

*Alaska Ctr. for Env't v U.S. Forest Serv.,*
189 F.3d 851 (9th Cir. 1999)...............................................................53, 54

*Alliance for the Wild Rockies v. Salazar,*
672 F.3d 1170 (9th Cir. 2012)........................................................30, 31, 46

*Ctr. for Biological Diversity v. Bernhardt,*
946 F.3d 553 (9th Cir. 2019).............................................................*passim*

*Ctr. for Biological Diversity v. Zinke,*
900 F.3d 1053 (9th Cir. 2018)...................................................................49

*Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019)...............................................................................41

*Fed. Power Comm'n v. Idaho Power Co.,*
344 U.S. 17 (1952)......................................................................................38

*Kootenai Tribe of Idaho v. Veneman,*
313 F.3d 1094 (9th Cir. 2002)....................................................................52

*Lands Council v. Powell,*
395 F.3d 1019 (9th Cir. 2005).....................................................................41

*Moreau v. Air France,*
356 F.3d 942 (9th Cir. 2004)......................................................................38

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
545 U.S. 967 (2005)....................................................................................51

*National Wildlife Federation v. Espy,*
45 F.3d 1337 (9th Cir. 1995),....................................................................52

*N.C. Fisheries Ass'n, Inc. v. Gutierrez,*
550 F.3d 16 (D.C. Cir. 2008) ....................................................................39

*West v. State, Bd. of Game*,
248 P.3d 689 (Alaska 2010)....................................................................6, 8

*San Luis & Delta-Mendota Water Auth. v. Locke,*
776 F.3d 97 (9th Cir. 2014).......................................................................38

*Sec. and Exch. Comm'n v. Chenery Corp.,*
    318 U.S. 80 (1943) ...............................................................................38, 39

*Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.,*
    100 F.3d 1443 (9th Cir. 1996) ..................................................................42

*The Steamboaters v. FERC,*
    759 F.2d 1382 (9th Cir. 1985) ..................................................................54

*Sturgeon v. Frost,*
    139 S. Ct 1066 (2019) ................................................................ 10, 36, 39

*Vill. of Kake v. U.S. Dep't of Agric.,*
    795 F.3d 956 (9th Cir. 2015) ....................................................................51

**Federal Statutes**

5 U.S.C. § 706(2)(A) ...........................................................................38

5 U.S.C. § 801–808.................................................................30, 47, 48

16 U.S.C. § 668dd.................................................................... 13, 33

16 U.S.C. § 3101(d) .............................................................................10

16 U.S.C. § 3202(a) ......................................................................*passim*

28 U.S.C. § 1331.................................................................................. 3

28 U.S.C. § 1291.................................................................................. 4

**State Statutes**

AS 16.05.255(k)(4). ........................................................................... 8

AS 16.05.255(k)(5). ........................................................................... 7

AS 16.05.050(a)(19). .......................................................................... 9

**Federal Regulations**

25 Fed. Reg. 33 (Dec. 29, 1959) ............................................... 6, 36, 40

58 Fed. Reg. at 5064-01 (Jan. 19, 1993)...................................... 14, 18

80 Fed. Reg. 29279-01 (May 21, 2015)............................................25

81 Fed. Reg. 27030-01 ..................................................................*passim*

81 Fed. Reg. 52248–01 (August 2016)................................................29, 30, 43, 44

85 Fed. Reg. 35181-01(June 9, 2020) ...................................................................47

86 Fed. Reg. 23794 (May 4, 2021)........................................................................14

6 Fed. Reg. 6471 (Dec. 18, 1941) .........................................................................10

43 C.F.R. § 46.205..........................................................................................29, 55

50 C.F.R. § 32.2.......................................................................................18, 35, 45

50 C.F.R. § 36.32............................................................................14, 37, 44, 49

50 C.F.R. § 36.39...................................................................................................26

## State Regulation

5 AAC 92.530(6) ...................................................................................................22

## Alaska Constitution

Alaska Const. art. 8, §§ 2, 4 .................................................................................40

## Other Authorities

Executive Order 8979; 6 Fed. Reg. 6,471 (Dec. 18, 1941) ...................................10

Executive Order 10857, 25 Fed. Reg. 33 (Dec. 29, 1959) ...........................6, 36, 40

Public Law 85-508, § 6(e), 72 Stat. 341 .........................................................6, 40

Public Law 96-487, 94 Stat. 2383 (Dec. 2, 1980)..........................................*passim*

Pub. L. No. 89–669, 80 Sta. 927 (Oct. 15, 1966)..................................................12

Pub. L. No. 105-57, 111 Stat. 1252 (1997).....................................................13, 30

## INTRODUCTION

In May 2016, the U.S. Fish & Wildlife Service (the Service) promulgated the first of two regulations that addressed state authorized hunting that it deemed "predator control" on National Wildlife Refuges in Alaska. It started by promulgating a refuge-specific regulation for the Kenai National Wildlife Refuge. Refuge-Specific Regulations; Public Use; Kenai National Wildlife Refuge, 81 Fed. Reg. 27030-01 (May 5, 2016). Among other limitations, the "Kenai Rule" banned the taking of brown bears over bait within the Kenai Refuge. It also preempted the State of Alaska's (State) attempt to open a hunting season for wolves, coyotes, and lynx within the Skilak Wildlife Recreation Area, a small area within the Kenai Refuge. The Service justified these limitations in the Kenai Rule as necessary to meet its mandate under the Alaska National Interest Lands Conservation Act (ANILCA) to "conserve healthy populations of wildlife in their natural diversity." *Id*. at 27033. The Service did not prepare either an environmental assessment or environmental impact statement to evaluate the effects of the rule, even though it stated that the rule was necessary to counteract the State's "liberalized" regulations and reduce human-caused mortality of Kenai brown bears. *Id.* at 27037.

Later that year, the Service followed the Kenai Rule with a rule that prohibited "predator control" statewide (Statewide Refuge Rule). Non-Subsistence

Take of Wildlife, and Public Participation and Closure Procedures, on National Wildlife Refuges in Alaska, 81 Fed. Reg. 52248–01 (Aug. 2016). As it had done with the Kenai Rule, the Service emphasized the need to maintain "natural diversity"—which it said required it to prohibit predator control on Alaska refuges, unless predator control was determined necessary to meet refuge purposes. *Id.* at 52252. The Service specifically identified hunting brown bears over bait as predator control and banned the practice. It also concluded that its legal framework to manage the National Wildlife System in Alaska—natural diversity—was different than the State's legal framework for managing wildlife on a sustained yield principle. *Id.*

Co-appellants the State of Alaska and Safari Club International, among others, opposed the Kenai Rule. 3-ER-318-338. The State argued that although Congress granted the Service the authority to conserve fish and wildlife resources on federal land, Congress did not grant the Service the authority to define certain hunting activity as "predator control" and then completely ban that activity. 3-ER-319-330, 332. Moreover, the Service failed to adequately explain why it authorized black bear baiting, but decided that brown bear baiting created too much of a risk. 3-ER-323-24..

If Congress had not made clear its intent to preserve the State's ability to manage fish and wildlife based on its legal framework when it enacted ANILCA in

1980, Congress made it clear in 2017 when it amended ANILCA by passing legislation to invalidate the Statewide Refuge Rule. *See* Pub. L. No. 115-20, 131 Stat 86 (2017); *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 562 (9th Cir. 2019). Through that substantive amendment, Congress withdrew any discretion the Service had to ban predator control, or activities it defined as predator control, on refuges in Alaska.

Not only did the Service act arbitrarily and capriciously and not in accordance with the law when it promulgated the Kenai Rule, but it failed to comply with the procedural requirements of the National Environmental Policy Act (NEPA). One of the reasons the Service imposed the brown bear baiting ban was to limit the number of human-caused deaths of Kenai brown bears authorized by the State. *See* 81 Fed. Reg. at 27037. The Service's action had a direct impact on the environment and it needed to comply with NEPA; it failed to do so.

The Court should reverse the district court's determination that the Service acted within its authority and complied with the law and vacate the Kenai Rule.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. The State of Alaska appeals from the district court's final judgment dated November 16, 2020, 2-ER-87, as amended on February 8, 2021, 2-ER-78. Alaska timely filed its notice of appeal pursuant to Federal Rule of Civil

3

Procedure 4(a)(1)(B) on January 13, 2021. 2-ER-79-83. This Court's jurisdiction over the appeal arises from 28 U.S.C. § 1291.

## STATUTORY AUTHORITIES

All relevant statutory authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

1. On multiple occasions, Congress made clear that refuges in Alaska are unique and shall not be managed under all of the same mandates as refuges in the Lower 48. Through ANILCA, Congress expressly preserved the State of Alaska's ability to manage its fish and wildlife resources and recognized and affirmed the State's constitutional mandate to manage under the sustained yield principle. The Service categorized the State's brown bear baiting regulation and the opening of the Skilak Wildlife Recreation Area to hunting for wolves, coyotes, and lynx as "predator control" and justified its preemption of State law as being necessary to comply with its mandate to conserve fish and wildlife in their "natural diversity." Did the Service act contrary to the law when it concluded that its mandate under ANILCA was contrary to the State's constitutional mandate?

2. After implementing the Kenai Rule, the Service promulgated another rule that banned brown bear baiting statewide. In 2017, Congress passed legislation under the Congressional Review Act to invalidate the Statewide Refuge Rule, resulting in a substantive change to ANILCA and the National Wildlife Refuge

4

System Improvement Act (Improvement Act). Does the Kenai Rule violate ANILCA and the Improvement Act, as amended in 2017, by banning brown bear baiting within the Kenai Refuge and the hunting of certain predators within the Skilak Wildlife Recreation Area?

3. In 2007, the Service determined that black bear baiting was compatible with the purposes of the Kenai Refuge. It acknowledged that brown bears frequent black bear baiting stations, but did not find a substantial risk to the public because there was "no evidence" that remote baiting stations would create "garbage bears." In promulgating the Kenai Rule, the Service changed its position and concluded that brown bear baiting would create a public safety concern and increase the possibility of human-bear conflict. Did the Service act arbitrarily and capriciously when it failed to explain why increased black bear baiting was permitted, but the taking of brown bears over bait must be banned?

4. Actions taken by the Alaska Board of Game temporarily resulted in more brown bears being taken on the Kenai Peninsula in 2013. Through the Kenai Rule, the Service banned the taking of brown bears over bait to counteract the Board's actions and to decrease the amount of human-caused mortality of Kenai brown bears. Did the Kenai Rule change the "environmental status quo" and affect the environment such that the Service had to comply with NEPA's procedural requirements?

5

## STATEMENT OF THE CASE

### I. The State's management of Alaska's wildlife.

The Alaska Statehood Act of 1958 required the federal government to transfer "the administration and management of the fish and wildlife resources of Alaska" to the State of Alaska once the State "made adequate provision for the administration, management, and conservation of said resources in the broad national interest." Public Law 85-508, § 6(e), 72 Stat. 341. In April 1959, the Secretary of the Interior certified that Alaska's state law met this standard and the federal government transferred management authority over fish and wildlife resources within Alaska to the State on January 1, 1960. Executive Order 10857, 25 Fed. Reg. 33 (Dec. 29, 1959).

Since January 1960—for over 60 years—the State has managed fish and wildlife within Alaska pursuant to its "administration, management, and conservation" provisions recognized by the Secretary of the Interior as adequate to protect the "broad national interest." The foundation for the State's management is contained within the Alaska Constitution; "Alaska was the first state to have a constitutional article devoted to natural resources, and it is the only state to have a constitutional provision addressing the principle of sustained yield." *West v. State, Bd. of Game*, 248 P.3d 689, 692 (Alaska 2010). "Sustained yield" is defined by statute as "the achievement and maintenance in perpetuity of the ability to support

6

a high level of human harvest of game, subject to preferences among beneficial uses, on an annual or periodic basis." AS 16.05.255(k)(5).

Article 8, section 2 of the Alaska Constitution requires the State to manage and conserve all natural resources, including fish and wildlife, "for the maximum benefit of its people." Article 8, section 4 requires fish and wildlife to be "utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses." The Alaska Supreme Court has said that the term "sustained yield," as used in Alaska's constitution, has a "broad meaning" and "applies to both predator and prey populations, including populations of wolves and bears." *West*, 248 P.3d at 696. It has also held that the "management of wildlife resources may constitutionally include a selection between predator and prey populations." *Id.* at 698. This allows the State to engage in predator control—what it refers to as "intensive management"—to prefer one species over another in some management situations, but still requires the State to manage all wildlife, including predators, at a sustained yield. *Id.* at 697.

Predator control—controlling predator populations to increase prey populations—"is a practice with a long and sometimes controversial history in Alaska." *Id.* at 691. Although the Service now contends that any new hunting opportunities for predators is predator control and is inconsistent with its management directives, 3-ER-354, 374-75, the federal government has itself long

7

engaged in this practice. *West*, 248 P.3d at 691. Following World War II, the federal government used poison baiting and aerial hunting to control wolf populations throughout Alaska. *Id*. The State banned poison baiting after statehood, but the practice of aerial hunting continued. *Id.*

This case involves state authorized hunting that the Service defined as "predator control," but that did not qualify as predator control (intensive management) under the state statute. *See* AS 16.05.255 (k)(4).[1] The Alaska Board of Game authorized these hunting practices in 2013 and the practices included the baiting of brown bears at registered black bear stations and the opening of a portion of the Kenai National Wildlife Refuge to hunting for coyotes, lynx, and wolves. *See* 3-ER-374.

In Alaska, the Board of Game manages the methods and means of hunting, as well as where and when hunting may occur. Alaska divides the responsibility for managing fish and game between the Alaska Department of Fish & Game and its boards of fish and game. Relevant here, Alaska's Board of Game (the Board) is authorized and obligated to "provide for the conservation and development" of

---

[1] "Intensive management" is defined as "management of an identified big game prey population consistent with sustained yield through active management measures to enhance, extend, and develop the population to maintain high levels or provide for higher levels of human harvest, including control of predation and prescribed or planned use of fire and other habitat improvement techniques." AS 16.05.255(k)(4).

Alaska's wildlife resources. AS 16.05.221(b). This responsibility includes the ability to regulate "the conservation, development, or utilization of game in a manner that addresses whether, how, when, and where the public asset of game is allocated or appropriated." AS 16.05.255. It also includes the ability to establish seasons for hunting; define the allowable means and methods employed in the pursuit, capture, taking, and transport of game; and the ability to set quotas, bag limits, and harvest levels on the taking of game. AS 16.05.255(a). The Alaska Department of Fish & Game, through its Commissioner, administers regulations adopted by the Board in accordance with its statutory duty to "promote fishing, hunting, and trapping and preserve the heritage of fishing, hunting, and trapping in the state." AS 16.05.050(a)(19).

## II. The State's management authority over fish and wildlife within the Kenai National Wildlife Refuge.

When the Federal government transferred management authority over fish and wildlife to the State in 1960, it transferred management authority over fish and wildlife anywhere in Alaska, including fish and wildlife within federally owned and managed wildlife refuges. And if there had been any doubt as to the extent of the State's authority on federal land, the passage of ANILCA in 1980 extinguished that doubt. *See* Public Law 96-487, 94 Stat. 2383.

"ANILCA sought to 'balance' two goals, often thought conflicting."
*Sturgeon v. Frost*, 139 S. Ct 1066, 1075 (2019) (quoting 16 U.S.C. § 3101(d)).
"The Act was designed to 'provide[] sufficient protection for the national interest
in the scenic, natural, cultural and environmental values of the public lands in
Alaska.'" *Id.* (quoting 16 U.S.C. § 3101(d) (alternation in original)) "'[A]nd at the
same time,' the Act was framed to 'provide[] adequate opportunity for satisfaction
of the economic and social needs of the State of Alaska and its people.'" *Id.*
(quoting 16 U.S.C. § 3101(d) (alterations in original)).

To further the Act's first goal, ANILCA redesignated the Kenai National
Moose Range—established in 1941 by President Franklin D. Roosevelt[2]—as the
Kenai National Wildlife Refuge (Kenai Refuge). Pub. L. No. 96-487, § 303(4)(A)
(Dec. 2, 1980), 94 Stat. 2,371, 2,391. In addition to changing the name and
increasing the size of the refuge, Congress further defined the Kenai Refuge's
purposes:

> (B) The purposes for which the Kenai National Wildlife Refuge is
> established and shall be managed, include—,
>
> (i) to conserve fish and wildlife populations and habitats in their
> natural diversity including, but not limited to, moose, bears, mountain
> goats, Dall sheep, wolves, and other furbearers, salmonids and other
> fish, waterfowl and other migratory and nonmigratory birds;
>
> (ii) to fulfill the international treaty obligations of the United States
> with respect to fish and wildlife and their habitats;

---

[2] *See* Executive Order 8979; 6 Fed. Reg. 6,471 (Dec. 18, 1941).

(iii)   to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge;

(iv) to provide in a manner consistent with subparagraphs (i) and (ii), opportunities for scientific research, interpretation, environmental education, and land management training; and

(v) to provide, in a manner compatible with these purposes, opportunities for fish and wildlife-oriented recreation.

*Id.* § 303(4)(B).

The Secretary of the Interior's administration of the Kenai Refuge is governed by the provisions contained in § 304 of ANILCA. First, § 304(a) provided that each Alaskan refuge "shall be administered by the Secretary, subject to valid existing rights, in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act." Second, the Secretary needed to identify, among other things, "the populations and habitats of the fish and wildlife resources of the refuge" as well as any other "special value" of the refuge, such as archeological, cultural, ecological, scenic, or wilderness value. *Id.* § 304(g)(2). Third, the Secretary had to prepare a comprehensive conservation plan that "designate[d] areas within the refuge according to their respective resources and values;" "specif[ied] the programs for conserving fish and wildlife and the programs relat[ed] to maintaining the values"; and "specif[ied] the uses within each such area which may be compatible with the major purpose of the refuge." *Id.* § 304(g)(3)(A).

11

But just as Congress worked to further its first goal in ANILCA—protection for the national interest in the scenic, natural, cultural and environmental values of the public lands in Alaska—it also included provisions to protect its second goal—satisfaction of the economic and social needs of the State of Alaska and its people. As recognized by the Supreme Court in *Sturgeon*, "Congress [may have] set aside extensive land for national parks and preserves [when enacting ANILCA]—but [it did so] on terms different from those governing such areas in the rest of the country." 139 S. Ct at 1075.

The differences between Alaska's wildlife refuges and the wildlife refuges elsewhere in the country are significant. In 1966, Congress passed the National Wildlife Refuge System Administration Act (NWRSAA), which "gave guidance to the Secretary of the Interior in the overall management of the [National Wildlife Refuge] System," but did "not establish a mission for the System or contain any planning requirements." Pub. L. No. 89–669 (Oct. 15, 1966), 80 Sta. 927. In 1997, Congress enacted the National Wildlife Refuge System Improvement Act (Improvement Act) to "build[] upon the NWRSAA in a manner that provides an organic act for the System similar to those which exist for other public lands." *Id.* at 3. Under the Improvement Act, the mission of the Refuge System "is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant

12

resources and their habitats within the United States for the present and future generations of Americans." 16 U.S.C. § 668dd(a)(2).

But just as Congress directed in 1980 with the passage of ANILCA, the Improvement Act treats refuges in Alaska differently. The Improvement Act requires the Secretary, before allowing a new use in a refuge, or before expanding, renewing, or extending an existing use of a refuge, to determine whether the use is compatible with the purpose for which the refuge was established and the mission of the refuge system. 16 U.S.C. § 668dd(d)(3)(a)(i). Practically speaking, this means wildlife refuges outside of Alaska are "closed until open."

In Alaska, however, refuges are "open until closed." *See* 3-ER-329-30. A use within an Alaska refuge must be compatible with the refuge's purposes, ANILCA, Pub. L. No. 96-487, § 304(b), but Congress made clear in section 7 of the Improvement Act that Alaska refuges are not subject to the same conservation planning program as refuges in the Lower 48; instead, refuges in Alaska are governed by ANILCA. 16 U.S.C. § 668dd(e)(1)(A). And in section 9 of the Improvement Act, Congress expressly stated that, with regards to Alaska refuges, if there is any conflict between ANILCA and the Improvement Act, ANILCA controls. Pub. L. No. 105-57 § 9(b), 111 Stat. 1252 (1997) (statutory construction note regarding 16 U.S.C. § 668dd with respect to Alaska).

The Service has long recognized this distinction in its implementing regulations.[3] In 1981, the Service regulations provided that "[t]he taking of fish and wildlife [in Alaska] for sport hunting, trapping, and sport fishing is authorized in accordance with applicable State and Federal law." 50 C.F.R. § 36.32 (1981). Then, in 1993, the Service issued nationwide refuge-specific hunting and fishing regulations, 58 Fed. Reg. 5064–01 (Jan. 19, 1993); but for Alaska, it provided that "Alaska refuges are opened to hunting, fishing and trapping pursuant to the Alaska National Interest Lands Conservation Act," *id.* at 5069. Therefore, although the regulations provided a refuge manager the authority to close an area to the taking of a particular population of fish or wildlife, 50 C.F.R. § 36.32(a), the manager could do so only after considering the criteria set out in 50 C.F.R. § 36.42(b). To close an area, the refuge manager must consider factors

> such as public health and safety, resource protection, protection of cultural or scientific values, subsistence uses, endangered or threatened species conservation, and other management considerations necessary to ensure that the activity or area is being managed in a manner compatible with the purpose for which the Alaska National Wildlife Refuge area was established.

*Id.*

---

[3]     The Service also regularly recognizes this distinction in its station-specific hunting sport fishing regulations. For example, in the proposed rule for 2021–2022, the Service explained the NWRSAA, as amended, "closes [national wildlife refuges] in all States except Alaska to all uses until opened. 2021–2022 Station-Specific Hunting and Sport Fishing Regulations, 86 Fed. Reg. 23794 (May 4, 2021).

Importantly, in addition to setting Alaska refuges apart from those in the rest of the country, Congress also expressly preserved the State's authority to manage fish and wildlife in Alaska and approved of the State's constitutionally prescribed "sustained yield" management practice—the only such practice in the nation. Specifically, § 1314(a) of ANILCA provides

> Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for *management of fish and wildlife on the public lands* except as may be provided in title VIII of this Act, *or to amend the Alaska Constitution*.

16 U.S.C. § 3202(a) (emphasis added).

While recognizing the State's primary authority to manage the taking of fish and wildlife, Congress also preserved in ANILCA the federal government's primary control over the federal land:

> Except as specifically provided otherwise by this Act, nothing in this Act is intended to enlarge or diminish the responsibility and authority of the Secretary over the *management of the public lands*.

16 U.S.C. § 3202(b) (emphasis added).

This division of labor between the State (wildlife management) and the Service (habitat management) was further memorialized in a Master Memorandum of Understanding entered into by the Alaska Department of Fish and Game and the Service in 1980. 3-ER-431-32. The Master Memorandum of Understanding recognized the State's responsibility to manage, protect, maintain, enhance, and

15

rehabilitate the fish and wildlife resources of the State on a sustained yield principle and the Service's responsibility over "certain species or classes of wildlife," its responsibility over federal lands in Alaska, and its responsibility for the conservation of fish and wildlife resources on these lands. 3-ER-430. Each agency then made certain promises. The Department of Fish and Game specifically agreed to "recognize the Service as the agency with the responsibility to manage migratory birds, endangered species, or other species mandated by Federal law," and on "to conserve fish and wildlife and their habitats and regulate human use" on Service lands. 3-ER-432. The Service agreed to "[r]ecognize the Department [of Fish & Game] as the agency with the primary responsibility to manage fish and resident wildlife within the State of Alaska. *Id.* And each agency agreed that "the taking of fish and wildlife by hunting, trapping, or fishing on Service lands in Alaska is authorized in accordance with applicable State and Federal law unless State regulations are found to be incompatible with documented Refuge goals, objectives, or management plans." 3-ER-432.

### III.   Management of the Kenai National Wildlife Refuge.

Until recently, the State and the Service successfully worked together to fulfill ANILCA's competing goals in managing the Kenai Refuge. In 1985, with State input, the Service completed the first comprehensive conservation plan for the Kenai Refuge. It offered broad management guidance and provided that "[t]he

entire refuge would remain open to hunting and trapping, except for areas where public safety is a concern" as well as "the Skilak Loop Special Management Area, where special restrictions on hunting and trapping [would] apply." 3-ER-415. The comprehensive conservation plan provided that the Skilak Loop Special Management Area "would be managed to provide enhanced opportunities for wildlife viewing." 3-ER-408. In 1988, the Service renamed the area to the Skilak Wildlife Recreation Area ("Skilak WRA"). *Id.*

After adopting the comprehensive conservation plan, both the Service and the State worked to manage the Skilak WRA pursuant to the plan. The Service created a species management plan for the Skilak area to provide "wildlife viewing and interpretation opportunities," 3-ER-408, and the Alaska Board of Game adopted regulations (jointly proposed by the Department of Fish & Game and the Service for the Skilak area) which prohibited trapping, but allowed taking small game by archery and a moose hunt by special permit. *Id.*

The State opposed the hunting restrictions, but nevertheless cooperated with the Service's management of the Skilak WRA, and the Service also cooperated in the State's management of the Kenai Peninsula's brown bear population. In 1993, as part of its nationwide refuge-specific hunting and fishing regulations, the Service again recognized Alaska's uniqueness by exempting Alaska from a general provision prohibiting the hunting of bears over bait. Specifically, this regulation

17

provided that the "unauthorized distribution of bait and the hunting over bait is prohibited on wildlife refuge areas. (Baiting is authorized in accordance with State regulations on national wildlife refuges in Alaska)." 58 Fed. Reg. at 5065 (codified at 50 C.F.R. § 32.2).

Then, in 2007, the Service issued a compatibility determination, finding that black bear baiting for the purposes of hunting was a compatible use of the Kenai Refuge. 3-ER-398-405. At the time, state regulations did not authorize brown bear baiting, and the Service did not address this use in the 2007 determination. 3-ER-402. Nevertheless, the Service addressed the impacts of baiting on brown bears as it acknowledged that bears do not distinguish whether a baiting station is intended for black bears or brown bears. *Id.* And although there is some risk that "bears (both brown and black) that travel to a bait station and are rewarded with food or scraps but are not harvested by a hunter[] could become conditioned to human food or garbage,. . . there is no evidence that a bear that is rewarded at a remote bait station is any more or less likely to become a 'garbage bear.'" 3-ER-403. The Service also noted that there was no evidence that brown bears visiting black bear bait stations had increased the number of bears shot in self-defense. 3-ER-402.[4]

---

[4]     "One large male brown bear was shot in self defense by a hunter in recent years on the Refuge when going to a baiting area; however, the hunter had not yet placed any bait and was only exploring his permit area prior to the baiting season when he walked up unknowingly close to a large male brown bear which charged.

Also in 2007, the Service published a Revised Final Management Plan for the Skilak WRA. *See* 81 Fed. Reg. at 27033. Although it considered opening the Skilak WRA to the hunting of small game as well as lynx, coyote, red fox, and squirrel, the final plan continued to classify the Skilak WRA as "a special area . . . that would be managed to increase opportunities for wildlife viewing, and environmental education and interpretation." *Id.* at 27038. The Service did, however, approve a limited "youth-only" small game firearms hunt. *Id.* Later that year, the Board adopted state regulations consistent with the Revised Final Management Plan. *Id.* Three years later, after preparing an environmental impact statement, the Service issued an updated comprehensive conservation plan for the Kenai Refuge. *See* 81 Fed. Reg. 27030-01, 27031.

After years of working cooperatively, conflict arose between the Service and the State in 2013, when the Board adopted new regulations that would allow hunting brown bears over registered black bear baiting stations in the Kenai Refuge and opened the Skilak WRA to the hunting of wolves, coyote, and lynx in late fall and winter. 81 Fed. Reg. at 27038–40.

---

None of the other recorded 119 brown bear defense of life and property (DLP) shootings from 1964 through 2005 within [Game Management Unit] 15 have a known connection to a bait station." 3-ER-402.

19

**IV.    The Board allows hunting brown bears over bait and opens the Skilak WRA to additional hunting.**

      **A.    The State's management of the Kenai brown bear population and the Board's decision to allow additional hunting.**

In 2013, after the Service and the State both agreed that the Kenai brown bear population had increased to a level that warranted more hunting opportunities, 3-ER-375, the Alaska Board of Game increased temporarily the harvest limits of brown bears and authorized hunters to take brown bears over registered black bear baiting stations. 81 Fed. Reg. at 27038.

Under State management, the Kenai brown bear population had increased over the last 20 years. In 1998, the Alaska Department of Fish and Game classified this population of brown bears as a "population of special concern" due to concerns over population status, habitat loss, and increasing levels of human-caused mortality. 3-ER-343. This resulted in the State managing the Kenai brown bear population "conservatively" through 2011, utilizing primarily limited entry draw hunts and limiting the number of human-caused mortality of adult female bears. 3-ER-343-44. As a result of the State's management—as recognized by the Service—the Kenai brown bear population increased at an average rate of 3% per year between 1998 and 2010. 3-ER-343.

20

After a study conducted in June 2010, the Service and the U.S. Forest Service wildlife biologists estimated the population on the Kenai Peninsula at 582 brown bears. 3-ER-344. This was more than twice the population of brown bears estimated by Alaska Department of Fish and Game biologists in 1993. *Id.* Although the studies conducted in 1993 and 2010 used different methods and cannot be directly compared, both studies were consistent with the findings from the Service and the Alaska Department of Fish & Game that the Kenai brown bear population had increased and could support additional hunting opportunity and harvest. 3-ER-344, 355.

Consistent with the population studies, and its guiding principle of sustained yield under state law, the Alaska Board of Game took steps in 2012 to provide additional hunting and harvest opportunity of the Kenai brown bear. That year, the Board replaced a limited entry draw permit hunt in Game Management Units 7 and 15 with an unlimited entry registration hunt. 3-ER-344. Game Management Units 7 and 15 are on the Kenai Peninsula; much of unit 15 and a small portion of unit 7 lie within the Kenai Refuge. *Id.* The next year, the Board increased the harvest season length, allowed for the taking of brown bears at registered black bear bait stations, and allowed hunters to take 1 bear per regulatory year, rather than one every 4 years. *Id.* The Board also increased the harvest cap to 70 bears per year regardless of age or sex. *Id.* The 70-bear harvest cap was first applied in 2014; there was no

21

harvest cap in 2013. *Id*. Prior to 2013, hunting seasons were closed (or not opened) on the Kenai Peninsula once 10 adult reproductive-age human-caused mortalities (both hunting and non-hunting) occurred. *Id*. In March 2014, the Board reduced the harvest cap to no more than 17 reproductive-age female bears. *Id*.

According to the Kenai Refuge's Manager, the Board's regulatory changes increased human-caused mortality of brown bears on the Kenai Peninsula. 3-ER-345. From 1995 through 2011, the average annual human-caused mortality of brown bears was 21. *Id*. The annual average increased to 56 bears from 2012 to 2014.

### B. The Board's decision to allow additional hunting within the Skilak WRA.

In 2013, after years of limited hunting within the Skilak WRA, the Alaska Board of Game adopted a regulation allowing the harvest of wolves, coyotes, and lynx from November 10 through March 31, except within one-quarter mile of campgrounds and boat launches. 5 AAC 92.530(6). The Skilak WRA consists of 44,000 acres within the Kenai Refuge, 81 Fed. Reg. at 27038, and is a highly accessible area of the refuge due to its road access, 3-ER-319.

A member of Safari Club International proposed the opening to the Board, saying that it would expand opportunities for predator hunting in an area with "very limited road access" and could be used to utilize hunting as a management

22

tool in an area with "an abundance of furbearers." 3-ER-386. The Board agreed, but in recognition of the Service's management plan requiring the promotion of wildlife viewing, the Board limited this hunting season to November 10 through March 31—the "off-season" for wildlife viewing. 3-ER-361-72. The Board also reasoned that this additional hunting opportunity would benefit the moose population by removing "a few" predators. *Id.* As stated by the Board's Vice Chair:

> This is an opportunity to expand uses and—it's within sound principles of Fish and Wildlife management.
>
> We're not talking about—this isn't even a predator control program. This is just an opportunity for somebody to recreationally hunt predators. And so I think is a good cooperative opportunity to work with the refuge system on some of their mandates that actually closely align with our own.

3-ER-367.

## V.    The Service takes action to undermine the State's management authority.

From the beginning, the Service treated the Board's decision to allow hunting for brown bear over bait and the opening of the Skilak WRA as a form of "predator control." 3-ER-374. The Board adopted these proposals in a board meeting held in March 2013. *Id.* In comments submitted to the Board prior to that meeting, the Service stated that it believed the "primary objective" of these proposals was "to increase black and brown bear and wolf harvests as predator control measures

23

aimed at increasing moose populations" on the Kenai Peninsula and asked that the refuge lands be excluded. *Id*. It further stated that it believed the changes governing brown bear harvest "could result in unsustainable levels of harvest and overall human-caused brown bear mortality (hunting and non-hunting combined)." 3-ER-376. The Service opposed the opening of the Skilak WRA to additional hunting opportunity because an additional hunt was "inconsistent with the Service's management objectives for the area." 3-ER-377.

After the Board adopted the proposals, the Service sent a letter to Alaska's Department of Fish and Game. It again treated the Board's regulations as a form of predator control, saying "[w]hile these regulatory changes and their purposes were not formally identified as part of implementing the Department's intensive management program, the Service consider[ed] that reducing predator populations in support of intensive management program objectives [wa]s the underlying reason for the Board's actions." 3-ER-354. Although the Service believed that the "Kenai Peninsula brown bear population c[ould] support additional hunting opportunity and harvest," it believed "that allowing take of brown bears over bait substantially increase[d] the potential for unacceptably high levels of human-caused mortality." 3-ER-355. The Service again objected to the Board's decision to open the Skilak WRA to additional hunting because it believed additional hunting was inconsistent with its primary management objective to provide wildlife

24

viewing and other non-consumptive wildlife-dependent recreational opportunities. 3-ER-356.

To prevent the Board's regulations from becoming effective, the Service, pursuant to 50 C.F.R. 36.42, permanently closed the Skilak WRA to hunting and trapping on November 10, 2013, just before the State-authorized late fall and winter hunting season began, 78 Fed. Reg. 66061-01, 62 (Nov. 4, 2013), and blocked the Board's authorization of brown bear baiting in the Kenai NWR, 81 Fed. Reg. at 27036–37. The Board's brown bear baiting provision went into effect elsewhere, on non-federal land on the Kenai Peninsula.

### A. The Service promulgates a regulation to codify the closure and clarify its bear baiting regulation.

In May 2015, the Service published a proposed rule (the Kenai Rule) to, among other things, codify the closure of the Skilak WRA to hunting and trapping and to prohibit the taking of brown bears over bait. Refuge-Specific Regulations; Public Use; Kenai National Wildlife Refuge; 80 Fed. Reg. 29279-01 (May 21, 2015).

The Service did not do either an environmental assessment (EA) or an environmental impact statement (EIS) for the proposed rule. 80 Fed. Reg. at 29282. Instead, it concluded that the rule met a categorical exclusion within part 516 of its Departmental Manual (DM). *Id.* Specifically, 516 DM 8.5(C)(3)

categorically excludes the "issuance of special regulations for public use of Service-managed land, which maintain essentially the permitted level of use and do not continue a level of use that has resulted in adverse environmental impacts" from the EA or EIA requirements of the National Environmental Policy Act. *Id.* The Service reasoned that, at least for the Skilak WRA portion of the rule, that this rulemaking supported "the management direction identified through approved Refuge management plans, including the 2010 Kenai [Refuge] revised comprehensive conservation plan and the 2007 Kenai [Refuge] Skilak Recreation Area Revised Final Management Plan." *Id.* It also referenced the EIS it prepared for the 2010 comprehensive conservation plan and the EA it prepared for the 2006 Skilak WRA management. The Service did not explain why the categorical exclusion applied to the bear baiting portion of the rule. *Id.*

Despite receiving comments from the State, Safari Club International, and others opposing these portions of the Kenai Rule, the Service published the final Kenai Rule in May 2016. 81 Fed. Reg. at 27030 (codified at 50 C.F.R. § 36.39) Like the proposed rule, the final Kenai Rule prohibited hunting within the Skilak WRA (with exceptions for special permit moose hunts, hunting small game by archery and falconry, and limited youth-only small game firearm hunts), and prohibited hunting by bait within the refuge except for black bears by special permit. 81 Fed. Reg. 27045 (codified at 50 C.F.R. § 36.39(i)(5)(ii) & (6)).

26

In response to comments that the prohibitions were not necessary to meet the Service's legal mandates, the Service responded that it considered this regulation "necessary to meet[] [its] mandates under ANILCA to conserve healthy populations of wildlife in their natural diversity on the Refuge, to meet its Wilderness purposes, and to meet its purpose for providing compatible wildlife-oriented recreational opportunities, which include both consumptive and non-consumptive activities." 81 Fed. Reg. 27033 & 20735-36. It concluded that hunting brown bears over bait was inconsistent with its ANILCA mandates "due to its potential to result in overharvest of this species, with accompanying population-level impacts, due to its high degree of effectiveness as a harvest method and the species' low reproductive potential." *Id*. at 27036. The Service further explained that banning this practice was needed to counter "several [other] changes that substantially liberalized State regulations for sport hunting of brown bears on the Kenai Peninsula beginning in 2012." *Id*.

The Service also justified its prohibition on brown bear baiting by pointing to the harvest numbers from 2012 through 2014, and the harvest caps implemented by the Board in 2015. *Id.* at 27036–37. It argued that that the Board's changes to brown bear hunting regulations "reversed the previous increasing trajectory of the brown bear population and resulted in a decline of approximately 18 percent," and that such a "rapid reduction" posed conservation concerns. *Id.* at 27036. And, even

27

though the Board imposed stricter harvest caps in 2015, the Service concluded that harvest at even those lower numbers "would result in a continued reduction of the Kenai brown bear population." *Id.* at 27037. As such, the Service argued that it needed to further restrict the harvest limits by eliminating an effective form of hunting—baiting. The Service reasoned that, if it allowed baiting of brown bears, it "would increase human-caused mortality of Kenai brown bears to levels which would continue to reduce the population, with potential to result in conservation concerns for this population." *Id.*

In response to comments objecting to the closure of the Skilak WRA to additional hunting, the Service explained that "[f]urbearers such as wolves, coyote, and lynx occur in relatively low densities, and are not as easily observed as more abundant and/or less wary wildlife species." *Id.* at 27038. It then reasoned that allowing an annual hunt of individual wolves, coyote, or lynx would either reduce their numbers and/or change their behavior in such a way that would "reduce opportunities for the public to view or photograph or otherwise experience these species." *Id.*

As it did with the proposed rule, the Service concluded that the final Kenai Rule did not require either an EA or an EIS because it satisfied a categorical exclusion. *Id.* at 27043. It again found that the rule would maintain essentially the same level of use; it also concluded that the final Kenai Rule qualified for a

28

categorical exclusion because the rule is "technical and procedural in nature, and the environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis." *Id.* (citing 43 C.F.R. § 46.210).

**B. Congress rejects the Service's attempt to ban brown bear baiting in Alaska refuges.**

In August 2016, the Service promulgated a rule that expanded its prohibition on brown bear baiting to all Alaska refuges and restricted other State-authorized hunting practices that it deemed "predator control" (Statewide Refuge Rule). Non-Subsistence Take of Wildlife, and Public Participation and Closure Procedures, on National Wildlife Refuges in Alaska, 81 Fed. Reg. 52248–01 (August 2016). As it had done in the Kenai Rule, the later-adopted Statewide Refuge Rule emphasized the need to maintain "natural diversity" of all refuges in Alaska. *Id.* at 52252. To accomplish this objective, the Service concluded that it must prohibit "predator control" unless it was determined necessary to meet a refuge objective. It specifically identified the taking of brown bears over bait to be one of the predator control practices prohibited by the rule. *Id.*

To support the need for this statewide regulation, the Service pointed to Board actions to "liberalize the State's regulatory frameworks for general hunting and trapping of wolves, bears, and coyotes." *Id.* at 52251. It further explained that

it prohibited "harvesting brown bears over bait due to the potential to reduce their population by significantly increased harvest rates." *Id*. at 52261.

Congress subsequently invalidated the Statewide Refuge Rule through a joint resolution passed via the Congressional Review Act. *See* Pub. L. No. 115-20, 131 Stat. 86 (2017). The Congressional Review Act gives Congress an expedited procedure to review and disapprove of federal regulations, 5 U.S.C. §§ 801-808, and once an agency's rule has been disapproved of by a joint resolution, the agency may not reissue the same rule "in substantially the same form." 5 U.S.C. § 801(b)(2). The Act also prohibits the agency from issuing "a new rule that is substantially the same" as the disapproved rule unless there is a subsequent change in the relevant law. *Id.*

This Court upheld the joint resolution invalidating the Statewide Refuge Rule in December 2019. In *Center for Biological Diversity v. Bernhardt*, the Court held, "[w]hen Congress enacts legislation that directs an agency to issue a particular rule, 'Congress has amended the law.'" 946 F.3d 553, 562 (9th Cir. 2019) (quoting *Alliance for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012)). It went on to conclude that, "[b]y enacting the Joint Resolution, Congress amended the substantive environmental law and deprived the Refuges Rule of any force or effect." *Id.* "Accordingly, the Joint Resolution is enforceable as a change to substantive law, even though it did not state that it constituted an

amendment to the National Wildlife Refuge System Administration Act, the National Wildlife Refuge System Improvement Act, or ANILCA." *Id.*

## VI. The State files suit, and the district court grants summary judgment in favor of the Service.

The State and Safari Club International filed suit and challenged three aspects of the Kenai Rule: (1) the prohibition of State-authorized wolf, coyote, and lynx harvests within the Skilak WRA; (2) banning the discharge of firearms along the Kenai and Russian Rivers (with limited exceptions); and (3) the prohibition of State-authorized hunting of brown bears over bait. 3-ER-218-305.

The district court granted the Service's motion for summary judgment, upholding the limitation on hunting with the Skilak WRA and the prohibition on brown bear baiting.[5] 1-ER-1-76. The district court rejected the State's argument that the Service needed to prepare an EA or EIS; it concluded that NEPA did not apply to the Skilak WRA closure or the brown bear baiting provision because the Service was simply maintaining the "environmental status quo." 1-ER-28-29.

---

[5]     The district court partially granted the State's and Safari Club International's motion for summary judgment on the firearms restrictions, concluding that the Service failed to "adequately explain its decision" that a categorical exclusion applied and alleviated the need for either an EA or EIS under NEPA. 1-ER-34. The Service dismissed its cross-appeal of that issue. Dkt. 18. Thus, the only issues on appeal deal with the limitation on hunting within the Skilak WRA and the prohibition of State-authorized hunting of brown bears over bait.

The court also rejected the State's arguments under ANILCA, the Improvement Act, and the Administrative Procedure Act. The court rejected the State's arguments under ANILCA, relying on 16 U.S.C. § 3202(c) to conclude that the Service had the authority to manage fish and wildlife on federal land. 1-ER-47. (providing that the taking of fish and wildlife in national refuges "shall be carried out in accordance with the provisions of this Act *and other applicable State and Federal law.*" (emphasis added)). And, the district court reasoned, when there is a clear conflict between federal and state law, federal law controls. *Id.*

To further support its conclusion that Congress intended to allow federal agencies to manage hunting, the district court relied on § 304(a) and (g)(1) of ANILCA. Section 304(a) provides that each refuge shall be administered, subject to valid existing rights, "in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act." Section 304(g)(1) directs the Service to prepare comprehensive conservation plans for each refuge. The plans "shall . . . designate areas within the refuge according to their respective resources" and "specify the uses within each such area which may be compatible with the major purposes of the refuge." Pub. L. No. 96-487, § 304(g)(3)(A)(i), (ii). Looking to § 304, the district court pointed out that from the very first conservation plan—issued in 1985—the Service has determined that hunting should be restricted in the Skilak WRA "so wildlife would become more abundant, less wary,

and easily viewed." 1-ER-49-50. It further reasoned that § 304(g) specifically allowed the Service to specify the "uses within each area which may be compatible with the major purposes of the refuge," and as such, the Service's decision to prohibit brown bear baiting, restrict hunting in the Skilak WRA, and restrict hunting in the Kenai and Russian river corridors was a valid exercise of that authority. 1-ER-50.

Having concluded that the Service was not bound by state law that conflicts with its management directives, the district court rejected the State's and Safari Club International's argument that the Kenai Rule impermissibly elevated "one compatible priority use ([wildlife] viewing) over another (hunting)." 1-ER-50. It concluded that, even if the Skilak restrictions were an impermissible prioritization of wildlife viewing over hunting under the Improvement Act, § 304(g) of ANILCA allows the Service to set aside different areas within a refuge for different uses. And if there is a conflict between ANILCA and the Improvement Act, ANILCA prevails. 1-ER-53-54; *see* Pub. L. No. 105-57 § 9(b), 111 Stat. 1252 (1997) (statutory construction note regarding 16 U.S.C. § 668dd with respect to Alaska).

Both the State and Safari Club International also argued that the Service's restrictions were arbitrary and capricious, which the district court rejected. The court concluded that the Service provided a reasonable justification to continue the hunting restrictions. It noted that the Service based its conclusion that the

33

restrictions were needed to support wildlife viewing on the Skilak WRA's "small size, its accessibility by road, proximity to population centers, and likely hunting (or trapping) pressure." 1-ER-58. Because accessibility to road and proximity to population centers were among the very reasons the State opened predator hunting opportunities in the Skilak WRA, the district court found the Service's conclusion that opening Skilak to more hunting would result in significant additional pressure on local wildlife was "plausible" and supported by the record. 1-ER-59-62. It further concluded that the Service's prediction about wildlife numbers required "substantial deference" because it is within the Service's area of expertise. 1-ER-59.

The district court also rejected the State's and Safari Club International's arguments that the bear baiting rule was arbitrary and capricious. The court found that the Service adequately explained its position by citing two sources that provided additional information on the effects of bear baiting on creating food-conditioned bears. 1-ER-69. It further found that the Service had adequately justified the difference between its position on black bear baiting and brown bear baiting. The court credited the Service's explanation that "[b]lack bears occur in much higher densities than brown bears on the Kenai Peninsula, have higher reproductive potential than brown bears, and as such can support higher harvest levels and are less susceptible to overharvest." 1-ER-70. It also credited the

Service's explanation that the brown bear population is "highly sensitive to adult female and overall human-caused mortality levels," and "timely and accurate monitoring of the status of the Kenai Peninsula brown bear population is extremely difficult at best." *Id.* Therefore, although the State established harvest caps for brown bears, the district court believed the Service's restriction was rationally related to its justification because there was "ample data" in the record to show that liberalized brown bear baiting rules would cause increased human-caused mortality. And, the Service had determined that human-caused mortality at current harvest caps would result in a continued reduction of the Kenai brown bear population that could result in conservation concerns. 1-ER-69-70.

The State and Safari Club International had also argued that the bear baiting restriction was inconsistent with 50 C.F.R. § 32.2(h). This regulation reads: "The unauthorized distribution of bait and the hunting over bait is prohibited on wildlife refuge areas. (Baiting is authorized in accordance with State regulations on national wildlife refuges in Alaska)." Although the district court recognized a plausible reading where the parenthetical confers deference to the State's bear baiting rules, the court concluded that the Service's interpretation was not plainly erroneous nor inconsistent with the wording of the regulation. 1-ER-75. It had argued that the parenthetical "merely served to clarify that the 'General Provision[]' prohibiting 'hunting over bait . . . on wildlife refuge areas' did not

35

apply to refuges in Alaska, which were 'opened to hunting, fishing, and trapping' under ANILCA and governed by 'specific refuge regulations.'" *Id.*

## SUMMARY OF THE ARGUMENT

When Congress set aside additional land for national parks and refuges in Alaska with the passage of ANILCA, it did so "on terms different from those governing such areas in the rest of the country." *Sturgeon*, 139 S. Ct. at 1075. Congress knew the State managed fish and wildlife resources in Alaska based on the sustained yield principle; the Secretary of the Interior had previously found the State's legal framework sufficient to serve the "broad national interest." Executive Order 10857, 25 Fed. Reg. 33 (Dec. 29, 1959). And, in passing ANILCA, Congress said that nothing in the Act was "intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on public lands," and that nothing in the Act was meant to "amend the Alaska constitution." 16 U.S.C. § 3202(a).

The Service exceeded its statutory authority under ANILCA by concluding that its mandate to manage for "natural diversity" somehow differed from the State's mandate to manage for a "sustained yield." The Service further acted contrary to the law when it concluded that its mandates required it to ban hunting that it had deemed to be predator control. The Service has the authority to conserve wildlife resources when necessary, but it does not have the authority to regulate

36

specific methods of hunting that are particularly effective, or to close an entire area to hunting for predators simply because it concludes the State is trying to manage a predator population. If not clear before, Congress made this clear in 2017 when it invalidated the Statewide Refuge Rule and amended ANILCA and the Improvement Act. *See Ctr. for Biological Diversity*, 946 F.3d at 562.

The Service also failed to sufficiently explain why it treats brown bear baiting differently than black bear baiting. Both species of bears visit the already authorized baiting stations. By allowing black bear baiting, there was already a risk that brown bears would become conditioned to human food. Yet, only after the State authorized hunters to take brown bears at baiting stations did the Service develop a concern about an increase of human-bear conflict.

By banning brown bear baiting the Service expressly took action to control brown bear populations. It disagreed with the State's harvest limits, but rather than acting within its authority under 50 C.F.R. § 36.32(a), the Service manipulated population numbers by banning an effective form of hunting. The Service's action impacted the environment, and consequently, it needed to comply with NEPA. It failed to do so when it invoked a categorical exclusion without adequately explaining why.

## STANDARD OF REVIEW

This Court reviews a district court's summary judgment ruling de novo, as well as the lower court's evaluations of an agency's action. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 991 (9th Cir. 2014). It also reviews de novo the district court's statutory interpretation. *Moreau v. Air France*, 356 F.3d 942, 945 (9th Cir. 2004).

This Court upholds an agency action under the Administrative Procedures Act unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 994 (citing 5 U.S.C. § 706(2)(A)). Under this standard, it will "sustain an agency action if the agency has articulated a rational connection between the facts found and the conclusions made." *Id.* "The arbitrary or capricious standard is a deferential standard of view under which the agency's action carries a presumption of regularity." *Id.* The Court does not substitute its judgment for that of the agency; it determines only whether "the agency complied with the procedural requirements of the APA." *Id.* But if the Court concludes that the agency made an "error of law," the court's inquiry is at an end, and the case must be remanded to the agency for further action consistent with the correct legal standards. *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952) (When reviewing an administrative decision, "the function of the reviewing court ends when an error of law is laid bare."); *Sec. and Exch. Comm'n v. Chenery Corp.*, 318

U.S. 80, 94 (1943) (stating that an agency action may not stand if the agency "has misconceived the law"); *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) ("[W]hen a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end; the case must be remanded to the agency for further action consistent with the corrected legal standards." (internal quotations omitted)).

## ARGUMENT

### I.   The Service exceeded its authority under ANILCA by prohibiting hunting that it considered to be "predator control."

ANILCA does not grant the Service the authority to define particularly effective methods and means of hunting as "predator control" and prohibit such activity on wildlife refuges in Alaska. As the Supreme Court stated in *Sturgeon*, ANILCA balances two, sometimes conflicting goals—protecting the national interest in the scenic, natural, cultural, and environmental values on public lands in Alaska *and* providing for an adequate opportunity for the State of Alaska and its citizens to satisfy their economic and social needs. 139 S. Ct. at 1074. So although the Service has an interest in "conserv[ing] fish and wildlife populations and habitats in their natural diversity," Pub. L. No. 96-487, § 303(4)(B), that interest does not allow the Service to prohibit hunting activities that the Service unilaterally defines as predator control, 16 U.S.C. § 3202(a).

Congress protected the State's role in managing the methods and means of hunting in Alaska—including on federal land—when it enacted ANILCA. Section 1314(a) provided that "[n]othing in this Act is intended to enlarge or *diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on public lands* except as may be provided in subchapter II of this chapter, *or to amend the Alaska constitution*."[6] 16 U.S.C. § 3202(a) (emphasis added). Relying on legislative history, the district court concluded that § 1314(a) was meant to "maintain the status quo in historic Federal-State relations concerning fish and wildlife management." 1-ER-47. Although that may be true, the district court failed to consider what the "status quo" was in Alaska.

In April 1959, the Secretary of the Interior certified that the State of Alaska had passed sufficient state laws to administer, manage, and conserve fish and wildlife resources "in the broad national interest," and the Federal government transferred management authority of these resources to the State in 1960. Executive Order 10857, 25 Fed. Reg. 33 (December 29, 1959); *see also* Pub. L. 85-508, § 6(e), 72 Stat. 341. Since 1960, the State has managed fish and wildlife resources in Alaska "for the maximum benefit of its people," and according to a "sustained yield principle." Alaska Const. art. 8, §§ 2, 4. The Secretary of the

---

[6]     Subchapter II protected opportunities for rural residents of Alaska to continue subsistence practices, *see* Pub. L. No. 96-487, § 3111, and is not at issue here.

Interior determined that these principles were sufficient to protect "the broad national interest" in 1959, and Congress reaffirmed that finding in § 1314(a) of ANILCA. In addition to protecting the "status quo," as the legislative history suggests, § 1314(a) also expressly stated that nothing within ANILCA was meant to "amend the Alaska constitution." 16 U.S.C. § 3202(a). In other words, Congress knew that the State managed via sustained yield and expressly affirmed that practice when it passed ANILCA.

It is true, as the Federal appellees argued below, that neither the proposed nor final Kenai Rules mention "predator control" or "sustained yield." 1-ER-53. (restating the Federal appellees' argument that "the Kenai Rule does not rely on notions of 'intensive management' or 'predator control'"). But nothing requires a court to limit its review of agency action to the four corners of the proposed or final rule. When reviewing agency action under the Administrative Procedure Act, a court's review includes not only the final agency action, but also the entirety of the administrative record provided to support that agency action. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019) (stating that a court is limited "to evaluating the agency's contemporaneous explanation in light of the *existing administrative record*." (emphasis added)); *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005) ("We have previously stated that '[j]udicial review of an agency decision typically focuses on the administrative record in existence at

41

the time of the decision and does not encompass any part of the record that is made initially in the reviewing court.'" (quoting *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

There is ample evidence in the administrative record to show that the Service banned brown bear baiting and closed the Skilak WRA to additional hunting because it viewed the authorized hunting practices as a form of "predator control" which it perceived as contrary to the Service's management directive to maintain "natural diversity." In its March 2013 comments, the Service informed the Board that it believed the Board's "primary objective" with the proposed regulations was to "increase black and brown bear and wolf harvests as predator control measures aimed at increasing moose populations." 3-ER-374. The Service's concern extended to the proposed opening of the Skilak WRA to additional hunting, as well as the proposed brown bear baiting regulation. *Id.* The Service further explained

> Should the Board adopt hunting regulations for bears and wolves aimed at supporting implementation of intensive management (though they may not formally be designated as such), or for other species as predator control measures, Refuge lands need to be excluded. Without action by the Board to exclude Refuge lands, the only alternative left for the Service is use of its own regulatory authorities to ensure adherence with our legal mandates, regulations, policies and management direction for the Refuge.

*Id.*

42

The Service raised the same concerns regarding both brown bear baiting and additional hunting within the Skilak WRA in a letter to the Alaska Department of Fish & Game after the Board adopted the regulations. 3-ER-354-359. The Service informed Fish & Game that, "[w]hile these regulatory changes and their purposes were not formally identified as" predator control or intensive management, "the Service consider[ed] that reducing predator populations in support of intensive management program objectives [wa]s the underlying reason for the Board's actions." 3-ER-354. The Service further stated its belief that its "mandates and policies necessitate wildlife management strategies and objectives on national wildlife refuges which fundamentally differ from those of the State of Alaska's intensive management program." *Id.*

The Service elaborated on its justifications in 2016, when it moved to expand the ban on brown bear baiting to all wildlife refuges in Alaska by promulgating the Statewide Refuge Rule. *See* 81 Fed. Reg. 52248–01 (Aug. 2016). There, it explained its belief that Alaska's framework, which has existed since 1959 and is based on the sustained yield principle, was inconsistent with its management directives for national wildlife refuges. *Id.* at 52251.

> The State of Alaska's (State) legal framework for managing wildlife is based on a different principle than the legal framework applicable to management of the [national wildlife refuge] system; it is based on the principle of sustained yield.

43

*Id.* The Service then identified several hunting methods that it viewed as "predator control" that it banned via this final rule. *Id.* at 52252. One of these methods was the taking of brown bears over bait. *Id.*

To be sure, the State recognizes that the Service has an interest in the fish and wildlife resources that exist on federal land and that it has a mandate "to conserve fish and wildlife populations and habitats in their natural diversity." *See* ANICLA, Pub. L. No. 96-487, § 303(4)(B). But its interest is in protecting populations of species. If the Service was concerned that a State management practice would reduce the brown bear population below the threshold requirement for "natural diversity"—or for sustained yield—its alternative was to close that area to hunting. *See* 50 C.F.R. § 36.32(a). The Service did not, however, have the authority to prohibit a particular hunting practice (bear baiting) or close an entire area to hunting (Skilak WRA) simply because it did not like the hunting practice or believed that the State was targeting predator populations. *See* 3-Er-382 (stating that bear baiting may violate "principles of fair chase and ethical hunting" or a "values-based perception" that "this method of take of an iconic wildlife species is simply not acceptable").

Prior to the Kenai Rule, the Service mostly recognized this limitation on its authority. Its regulations granted the refuge manage the authority to close areas of a refuge to hunting. 50 C.F.R. § 36.32(a). Section 36.42(a) granted the refuge

44

manager further authority to "close an area or restrict an activity" after considering certain factors, such as resource protection. Read together, if there was a valid conservation concern, the refuge manager could close an area to hunting, or it could restrict hunting by limiting the area where it could occur or the period when it could occur, but nothing within ANILCA or its implementing regulations granted the refuge manager authority to limit or prohibit state-authorized methods and means of brown bear hunting. *See also* 50 C.F.R. § 32.2(h) ("The unauthorized distribution of bait and the hunting over bait is prohibited on wildlife refuge areas. (Baiting is authorized in accordance with state regulations on national wildlife refuges in Alaska.)").

In promulgating the Kenai Rule, the Service went too far; it exceeded its authority under ANILCA and violated its own regulations. The administrative record makes clear that the Service viewed brown bear baiting and the hunting of wolves, coyotes, and lynx in the Skilak WRA as a form of "predator control." But neither ANILCA nor its implementing regulations granted the Service the authority to overrule state-authorized methods of hunting simply because those methods may result in higher success rates for a predator species. ANILCA preserved the State's right to manage the methods or means of hunting, including the State's constitutionally mandated practice of managing based on the sustained yield principle. Accordingly, the district court erred when it concluded that the Service

45

acted in accordance with the law. The State respectfully requests that this Court reverse the district court and vacate the Kenai Rule.

## II.  The Kenai Rule violates Congress's 2017 amendments to ANILCA.

To the extent the Service had the authority to ban predator control—or methods and means of hunting that it defined as predator control—Congress extinguished that authority in 2017 when it invalided the Statewide Refuge Rule via the Congressional Review Act. *See* Pub. L. No. 115-20, 131 Stat. 86 (2017). As recognized by this Court in *Center for Biological Diversity v. Bernhardt*, the Service promulgated the Statewide Refuge Rule based on concerns that "Alaska's intensive management program was 'in direct conflict' with the federal mandate for administering national wildlife refuges." 946 F.3d at 558 (quoting 81 Fed. Reg. 52248–01, at 52252). When Congress used the Congressional Review Act to pass a joint resolution to invalidate that rule, "Congress . . . amended the law." *Id.* at 562 (quoting *Alliance for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012)). Therefore, "the Joint Resolution [wa]s enforceable as a change to substantive law, even though it did not state that it constituted an amendment to the National Wildlife Refuge System Act, the National Wildlife Refuge System Improvement Act, or ANILCA." *Id.* And this substantive amendment made clear that intensive management or predator control was *not* in conflict with the Service's federal mandate for administering national wildlife refuges.

46

Therefore, even assuming the Service previously had the authority to

promulgate the Kenai Rule and ban brown bear baiting or close the Skilak WRA to

certain hunting because it resembled predator control or intensive management,

that authority ended in 2017 when Congress passed legislation to invalidate the

Statewide Refuge Rule.[7] The Congressional Review Act prohibits the Service from

reissuing the same rule "in substantially the same form," and it may not issue "a

new rule that is substantially the same" as the disapproved rule until there is a

change in the relevant law 5 U.S.C. § 801(b)(2). Although the Kenai Rule is not a

"new rule" in that it was promulgated before the Statewide Refuge Rule, the joint

resolution "substantively amended" ANILCA and the Improvement Act. *Ctr. For

Biological Div.*, 946 F.3d at 562. By substantively amending ANILCA and the

Improvement Act, Congress extinguished the Service's authority to regulate an

activity as predator control.

---

[7]      The National Park Service, another agency within the Department of the
Interior, recognized this limitation in 2020 when it revoked a rule that it
promulgated in 2015 that was "nearly identical" to the Statewide Refuge Rule. *See*
Alaska; Hunting and Trapping in National Preserves, 85 Fed. Reg. 35181-01, at
35182 (June 9, 2020). Justifying its reasons for revisiting its approach, the National
Park Service explained that "[w]hile refuges operate under different frameworks
than national preserves, [the joint resolution enacted] by Congress was taken into
account when interpreting consistency with the authorities and principles that were
common to both rulemakings, including statutory requirements for wildlife
management activities to be carried out under State law, as well as considering
how to complement regulations on surrounding lands and waters to the extent
legally practicable." *Id.*

In the district court proceedings, the intervenor-appellees argued that the State reads too much meaning into the joint resolution, and that Congress had the authority to invalidate the Kenai Rule but choose not to do so. *See* 2-ER-99. But it is the intervenor-appellees who read too much into Congress' non-action. Under the Congressional Review Act, "[i]f the Congress does not enact a joint resolution of disapproval . . . respecting a rule, no court or agency may infer any intent of the Congress from any action or inaction of the Congress with regard to such rule, related statute, or joint resolution of disapproval." 5 U.S.C. § 801(g). So Congress's inaction in 2016 with regards to the Kenai Rule means nothing, but its decision to invalidate the Statewide Refuge Rule in 2017 resulted in a substantive amendment to ANILCA and the Improvement Act.

In light of the 2017 amendments, the district court erred when it concluded that neither the brown bear baiting provision nor the Skilak WRA closure violated ANILCA or the Improvement Act.

### III.  The Service acted arbitrarily and capriciously when it banned brown bear baiting although it allowed black bear baiting.

The Service acted arbitrarily and capriciously when it banned brown bear baiting because it relied on a factor Congress had not intended it to consider—predator control—and because it did not have a substantial basis in fact given the

agency did not explain why there was only a substantial risk of safety with brown bear baiting but not black baiting. *See* 3-ER-398-405.

Here, the Service offered two justifications for its ban on brown bear baiting. 81 Fed. Reg. 27030-01, at 27036. First, it stated that the action was necessary to meet its mandate under ANILCA to conserve healthy populations of wildlife in their natural diversity. *Id.* Second, it stated that it "believ[ed] that baiting of brown bears has potential to modify bear behavior and increase human-bear conflicts, and that allowance of this method to take brown bears on the Refuge would result in increased baiting activity and pose an increased risk to public safety." *Id.*

As discussed above, Congress did not intend for the Service to rely on a hunting method's success rate when it took action to conserve wildlife populations. If the Service had concerns about the population of brown bears within the Kenai Refuge, it had other alternatives. S*ee* 50 C.F.R. § 36.32(a). But the Service did not have the authority to unilaterally define a hunting method as "predator control" and preempt the State from authorizing that specific practice. *See* 16 U.S.C. § 3202(a); *see also* Pub. L. No. 115-20, 131 Stat. 86 (2017); *Ctr for Biological Diversity*, 946 F.3d at 561–62; *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018) (stating that agency action is arbitrary and capricious if the agency relied on factors that Congress had not intended it to consider or acted so

"implausibl[y] that it could not be ascribed to a difference in view or the product of agency expertise").

In addition to relying on improper factors, the Service failed to adequately explain why there is a public safety concern with brown bear baiting when it already authorized black bear baiting. *See* 3-ER-398-405. As it acknowledged in its 2007 compatibility determination, bears will always be attracted to food and food smells, and although, at that time, the Board had only authorized the taking of black bears over bait, the bears did not make that distinction—brown bears also visit bait stations meant for black bears. 3-ER-402-03. And, despite the fact that brown bears already had access to bait stations, the Service stated there was "no evidence that a bear that [wa]s rewarded at a remote bait station [wa]s any more or less likely to become a 'garbage bear'" and there was no recorded incidents of a bear who visited a bait station needing to be destroyed because of fear for human life or safety. 3-ER-402-03.

The only explanation the Service provided in 2016 for its change of position over brown bear baiting was speculation about an increased potential for risk resulting from additional baiting activity. 81 Fed. Reg. at 27037. But the Service's own rule did not support that assumption. The Service recognized that the number of permitted black bear baiting stations on the Kenai Peninsula had increased from roughly 300 in years prior to just over 400 bait stations in 2014 and 2015. *Id*. Yet,

despite that increase in bear baiting stations, the Service offered no actual evidence of increased risk or increased human-bear conflicts. *Id.* When both brown and black bears already visit the same baiting stations, the Service offered no explanation to justify why allowing a hunter to take a brown bear over bait when the hunter was already allowed to take a black bear resulted in an increase to public safety. The "[u]nexplained inconsistency" between the Service's action regarding brown bear baiting as opposed to black bear baiting "is 'a reason for holding [the Service's] . . . interpretation to be an arbitrary and capricious change.'" *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.* 545 U.S. 967, 981 (2005)).

## IV. The Service failed to comply with the procedural requirements of NEPA in enacting the brown bear baiting portion of the Kenai Rule.

### A. NEPA applies to the brown bear baiting provision.

The Service banned brown bear baiting, in part, to reduce the number of brown bears harvested on the Kenai Peninsula. Because the State's changes to the harvest number had already taken effect, regardless of the method of harvest, the Service's action changed the "environmental status quo" and the agency was required to comply with NEPA.

Relying on *California v. Bureau of Land Management*, ___ F. Supp. 3d ____, 2020 WL 1492708 (N.D. Cal. Mar. 27, 2020), and *National Wildlife Federation v. Espy*, 45 F.3d 1337 (9th Cir. 1995), the district court concluded that the Kenai Rule "had no effect on the human environment," and therefore, the Service had no obligation to comply with NEPA. 1-ER-29. But in so ruling, the district court misdirected its focus. Instead of focusing on the Service's action— banning brown bear baiting—the district court needed to focus on the perceived effect of the Service's action—the reduction of the number of brown bears being harvested. *See Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) (focusing on the effects of the roadless rule when determining that NEPA procedures applied).

In *Kootenai Tribe of Idaho v. Veneman*, this Court held that NEPA applied to the Forest Service's adoption of a roadless rule on national forest lands. 313 F.3d at 113-15. Although the Court recognized that NEPA procedures did not apply when the agency action "maintain[ed] the environmental status quo," the Court concluded that the roadless rule did more than just prevent roads, it altered how the Forest Service managed the land. *Id.*

The same holds true for the bear baiting provision of the Kenai Rule. Although the district court was correct in that the Board's regulations allowing

brown bear baiting never went into effect on the Kenai Refuge, that view was too limited. The Board also took other actions—including increasing the number of brown bears allowed to be harvested—that did go into effect. The Service promulgated the Kenai Rule expressly to counteract what it viewed to be "liberalized State regulations for sport hunting of brown bears." 81 Fed. Reg. at 27036. It sought to implement the baiting ban because it believed the State's harvest limits were too high and allowing bear baiting "would increase human-caused mortality of Kenai brown bears to levels which would continue to reduce the population, with potential to result in conservation concerns for this population." *Id.* at 27037.

The Service sought to do more with its bear baiting provision than ban a specific hunting practice; it wanted to affect the environment on the ground by limiting the harvest caps imposed by the State to manage population numbers for sustained yield. As such, the district court erred in concluding that the procedural requirements of NEPA did not apply. 1-ER-29.

## B. The Service failed to adequately explain its reasons for applying a categorical exclusion.

An agency must "adequately explain its decision" to apply a categorical exclusion and proceed with an action in the absence of either an EA or an EIS. *Alaska Ctr. for Env't v U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999). This

requires a "convincing statement of reasons why potential effects are insignificant." *Id.* (quoting *The Steamboaters v. FERC*, 759 F.2d 1382, 1398 (9th Cir. 1985) ("An agency cannot avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment.")).

Here, the Service's reliance on a categorical exclusion faltered for the same reasons the district court found it insufficient for the firearms portion of the Kenai Rule. *See* 1-ER-35. Rather than explain how the restriction on bear baiting was "technical and procedural in nature," why the "environmental effects [we]re too broad, speculative, or conjectural to lend themselves to meaningful analysis," or how it "maintain[ed] essentially the permitted level of use," 181 Fed. Reg. at 27043, the Service merely "restated the exclusions" and did "not give sufficient reasons for its decisions." *Alaska Ctr. for the Env't*, 189 F.3d at 859. As the district court recognized, "[r]eciting the text of a categorical exclusion without elaboration or explanation does not constitute the required 'convincing statement of reasons' and does not allow the Court to determine 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" 1-ER-35 (quoting *Alaska Ctr. for the Env't*, 189 F.3d at 859).

Nor did the Service, as the district court found, adequately explain why an exception to the categorical exclusion for extraordinary circumstances did not

apply. 1-ER-36. The Service's regulations required it to identify "extraordinary circumstances" under which actions otherwise covered by a categorical exclusion would require analysis under NEPA. 43 C.F.R. § 46.205(c). An extraordinary circumstance includes an action that will "[h]ave highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources." *Id.* § 46.215(c). Here, the Service itself recognized the possibility of public controversy, stating that the Kenai Rule was "expected to be moderately controversial as the State of Alaska and some affected user groups will likely oppose some aspects of the rule." 3-ER-342. But nowhere in the Kenai Rule does the Service explain why it believed the categorical exclusion applied, despite the likelihood of this public controversy. "Such an omission violate[d] the Service's statutory duty to adequately explain its decision and [wa]s not harmless because it [wa]s not apparent from the single statement in the outreach plan that the Service conducted a thorough analysis of the issue." 1-ER-37.

For these reasons, NEPA requires the Court to remand the brown bear baiting provision to the Service so that the agency may reasonably explain its course of action.

## CONCLUSION

The State of Alaska respectfully requests that the Court reverse the district court and vacate the Kenai Rule.

Date: July 21, 2021.

TREG R. TAYLOR
ATTORNEY GENERAL

*/s/ Jessica M. Alloway*
Jessica M. Alloway
Alaska Bar No. 1205045

## STATEMENT OF RELATED CASES

The State is not aware of any related cases pending before this Court.

Date: July 21, 2021.

TREG R. TAYLOR
ATTORNEY GENERAL

*/s/ Jessica M. Alloway*
Jessica M. Alloway

*Attorney for Appellant State of Alaska*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____ 21-35030, 21-35035 _____

I am the attorney or self-represented party.

**This brief contains** 13,002 **words,** excluding the items exempted by Fed.

R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/ Jessica M. Alloway_      **Date** July 21, 2021 _____

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2021, I electronically filed the foregoing and three volumes of a joint excerpt of record with an index volume with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: July 21, 2021.

> TREG R. TAYLOR
> ATTORNEY GENERAL
>
> */s/ Jessica M. Alloway*
> Jessica M. Alloway
>
> *Attorney for Appellant State of Alaska*

# ADDENDUM CONTENTS

**Federal Statutes**

5 U.S.C. § 801 ............................................................................1

16 U.S.C. § 668dd........................................................................1

16 U.S.C. § 3202........................................................................3

ANILCA, Pub. L. No. 96-487

Sec. 303(4)..............................................................................3

Sec. 304 ..................................................................................4

**State Statutes**

AS 16.05.050 ............................................................................5

AS 16.05.255 ............................................................................ 5

**Federal Regulations**

43 C.F.R. § 46.205......................................................................7

43 C.F.R. § 46.210......................................................................7

43 C.F.R. § 46.215......................................................................7

50 C.F.R. § 32.2........................................................................8

50 C.F.R. § 32.21......................................................................8

50 C.F.R. § 36.32......................................................................8

50 C.F.R. § 36.42......................................................................9

**Federal Statutes**

**5 U.S.C. § 801. Congressional review.**

. . .

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

. . .

(g) If the Congress does not enact a joint resolution of disapproval under section 802 respecting a rule, no court or agency may infer any intent of the Congress from any action or inaction of the Congress with regard to such rule, related statute, or joint resolution of disapproval.

**16 U.S.C. § 668dd. National Wildlife Refuge System**

(a) Designation; administration; continuance of resources-management-programs for refuges in Alaska; disposal of acquired lands; proceeds

. . .

(2) The mission of the System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans.

. . .

(d) Use of areas; administration of migratory bird sanctuaries as game taking areas; rights of way, easements, and reservations; payment of fair market value

. . .

(3)(A)(i) Except as provided in clause (iv), the Secretary shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a compatible use and that the use is not inconsistent with public safety. The Secretary may

A-1

make the determinations referred to in this paragraph for a refuge concurrently with development of a conservation plan under subsection (e).

. . .

(e) Refuge conservation planning program for non-Alaskan refuge lands

(1)(A) Except with respect to refuge lands in Alaska (which shall be governed by the refuge planning provisions of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3101 et seq.)), the Secretary shall--

(i) propose a comprehensive conservation plan for each refuge or related complex of refuges (referred to in this subsection as a "planning unit") in the System;

(ii) publish a notice of opportunity for public comment in the Federal Register on each proposed conservation plan;

(iii) issue a final conservation plan for each planning unit consistent with the provisions of this Act and, to the extent practicable, consistent with fish and wildlife conservation plans of the State in which the refuge is located; and

(iv) not less frequently than 15 years after the date of issuance of a conservation plan under clause (iii) and every 15 years thereafter, revise the conservation plan as may be necessary.

. . .

## 16 U.S.C. § 3202. Taking of fish and wildlife.

(a) Responsibility and authority of State of Alaska

Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands except as may be provided in subchapter II of this chapter, or to amend the Alaska constitution.

(b) Responsibility and authority of Secretary

Except as specifically provided otherwise by this Act, nothing in this Act is intended to enlarge or diminish the responsibility and authority of the Secretary over the management of the public lands.

(c) Areas controlled; areas closed, exceptions

The taking of fish and wildlife in all conservation system units, and in national conservation areas, national recreation areas, and national forests, shall be

carried out in accordance with the provisions of this Act and other applicable State and Federal law. Those areas designated as national parks or national park system monuments in the State shall be closed to the taking of fish and wildlife, except that--

    (1) notwithstanding any other provision of this Act, the Secretary shall administer those units of the National Park System, and those additions to existing units, established by this Act and which permit subsistence uses, to provide an opportunity for the continuance of such uses by local rural residents; and

    (2) fishing shall be permitted by the Secretary in accordance with the provisions of this Act and other applicable State and Federal law.

## ANILCA, Pub. L. No. 96-487

## Additions to existing refuges

## Sec. 303(4) Kenai National Wildlife Refuge

(A) The Kenai National Wildlife Refuge shall consist of the existing Kenai National Moose Range, including lands, waters, interests, and whatever submerged lands, if any, were retained in Federal ownership at the time of statehood, which shall be redesignated as the Kenai National Wildlife Refuge, and an addition of approximately two hundred and forty thousand acres of public lands as generally depicted on the map entitled "Kenai National Wildlife Refuge", dated October 1978, excluding lands described in P.L.O. 3953, March 21, 1966, and P.L.O. 4056, July 22, 1966 withdrawing lands for the Bradley Lake Hydroelectric Project.

(B) The purposes for which the Kenai National Wildlife Refuge is established and shall be managed, include--

    (i) to conserve fish and wildlife populations and habitats in their natural diversity including, but not limited to, moose bears, mountain goats, Dall sheep, wolves and other furbearers, salmonoids and other fish, waterfowl and other migratory and nonmigratory birds;

    (ii) to fulfill the international treaty obligations of the United States with respect to fish and wildlife and their habitats;

A-3

(iii) to ensure, to the maximum extent practicable and in a manner consistent with the purposes set forth in paragraph (i), water quality and necessary water quantity within the refuge;

(iv) to provide in a manner consistent with subparagraphs (i) and (ii), opportunities for scientific research, interpretation, environmental education, and land management training; and

(v) to provide, in a manner compatible with these purposes, opportunities for fish and wildlife-oriented recreation.

**Administration of Refuges**

**Sec. 304**

(a) Each refuge shall be administered by the Secretary, subject to valid existing rights, in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this act.

. . .

(g)(1) The Secretary shall prepare, and from time to time, revise, a comprehensive conservation plan (hereinafter in this subsection referred to as the "plan") for each refuge.

(2) Before developing a plan for each refuge, the Secretary shall identify and describe--

(A) the populations and habitats of the fish and wildlife resources of the refuge;

(B) the special values of the refuge, as well as any other archeological, cultural, ecological, geological, historical, paleontological, scenic, or wilderness value of the refuge;

(C) areas within the refuge that are suitable for use as administrative sites or visitor facilities, or for visitor services, as provided for in §1305 and §1306 of this Act;

(D) present and potential requirements for access with respect to the refuge, as provided for in Title XI; and

(E) significant problems which may adversely affect the populations and habitats of fish and wildlife identified and described under subparagraph (A).

(3) Each plan shall--

A-4

(A) be based upon the identifications and the descriptions required to be made under paragraph (2)--

    (i) designate areas within the refuge according to their respective resources and values;

    (ii) specify the programs for conserving fish and wildlife and the programs relating to maintaining the values referred to in paragraph (2)(B), proposed to be implemented within each such area; and

    (iii) specify the uses within each such area which may be compatible with the major purposes of the refuge; and

(B) set forth those opportunities which will be provided within the refuge for fish and wildlife-oriented recreation, ecological research, environmental education and interpretation of refuge resources and values, if such recreation, research, education, and interpretation is compatible with the purposes of the refuge.

## State Statutes

### AS 16.05.050. Powers and duties of commissioner

(a) The commissioner has, but not by way of limitation, the following powers and duties:

    (19) to promote fishing, hunting, and trapping and preserve the heritage of fishing, hunting, and trapping in the state.

### AS 16.05.255. Regulations of the Board of Game; management requirements

(a) The Board of Game may adopt regulations it considers advisable in accordance with AS 44.62 (Administrative Procedure Act) for

    (1) setting apart game reserve areas, refuges, and sanctuaries in the water or on the land of the state over which it has jurisdiction, subject to the approval of the legislature;

    (2) establishing open and closed seasons and areas for the taking of game;

    (3) establishing the means and methods employed in the pursuit, capture, taking, and transport of game, including regulations, consistent with resource conservation and development goals, establishing means and methods that may be employed by persons with physical disabilities;

    (4) setting quotas, bag limits, harvest levels, and sex, age, and size limitations on the taking of game;

(5) classifying game as game birds, song birds, big game animals, fur bearing animals, predators, or other categories;

(6) methods, means, and harvest levels necessary to control predation and competition among game in the state;

(7) watershed and habitat improvement, and management, conservation, protection, use, disposal, propagation, and stocking of game;

(8) prohibiting the live capture, possession, transport, or release of native or exotic game or their eggs;

(9) establishing the times and dates during which the issuance of game licenses, permits, and registrations and the transfer of permits and registrations between registration areas and game management units or subunits is allowed;

(10) regulating sport hunting and subsistence hunting as needed for the conservation, development, and utilization of game;

(11) taking game to ensure public safety;

(12) regulating the activities of persons licensed to control nuisance wild birds and nuisance wild small mammals;

(13) promoting hunting and trapping and preserving the heritage of hunting and trapping in the state.

. ..

(k) In this section,

. . .

(4) "intensive management" means management of an identified big game prey population consistent with sustained yield through active management measures to enhance, extend, and develop the population to maintain high levels or provide for higher levels of human harvest, including control of predation and prescribed or planned use of fire and other habitat improvement techniques;

(5) "sustained yield" means the achievement and maintenance in perpetuity of the ability to support a high level of human harvest of game, subject to preferences among beneficial uses, on an annual or periodic basis.

**Federal Regulations**

**43 C.F.R. § 46.205. Actions categorically excluded from further NEPA review.**

Categorical Exclusion means a category or kind of action that has no significant individual or cumulative effect on the quality of the human environment. See 40 CFR 1508.4.

(a) Except as provided in paragraph (c) of this section, if an action is covered by a Departmental categorical exclusion, the bureau is not required to prepare an environmental assessment (see subpart D of this part) or an environmental impact statement (see subpart E of this part). If a proposed action does not meet the criteria for any of the listed Departmental categorical exclusions or any of the individual bureau categorical exclusions, then the proposed action must be analyzed in an environmental assessment or environmental impact statement.

(b) The actions listed in section 46.210 are categorically excluded, Department-wide, from preparation of environmental assessments or environmental impact statements.

. . .

**43 C.F.R. § 46.210. Listing of Departmental categorical exclusions.**

The following actions are categorically excluded under paragraph 46.205(b), unless any of the extraordinary circumstances in section 46.215 apply:

. . .

(i) Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case.

**43 C.F.R. § 46.215. Categorical exclusions: Extraordinary circumstances.**

Extraordinary circumstances (see paragraph 46.205(c)) exist for individual actions within categorical exclusions that may meet any of the criteria listed in paragraphs (a) through (l) of this section. Applicability of extraordinary circumstances to categorical exclusions is determined by the Responsible Official.

(a) Have significant impacts on public health or safety.

(b) Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands;

A-7

wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands (EO 11990); floodplains (EO 11988); national monuments; migratory birds; and other ecologically significant or critical areas.

(c) Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources [NEPA section 102(2)(E) ].

(d) Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

(e) Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

. . .

## 50 C.F.R. § 32.2. What are the requirements for hunting on areas of the National Wildlife Refuge System?

(h) The unauthorized distribution of bait and the hunting over bait is prohibited on wildlife refuge areas. (Baiting is authorized in accordance with State regulations on national wildlife refuges in Alaska).

## 50 C.F.R. § 32.21. Alaska

Alaska refuges are opened to hunting, fishing, and trapping pursuant to the Alaska National Interest Lands Conservation Act (Pub.L. 96–487, 16 U.S.C. 3101 et seq.). The regulations set forth at 50 CFR part 36 concern National Wildlife Refuges in Alaska. Information regarding specific refuge rules can be obtained from the Regional Office of the U.S. Fish and Wildlife Service, Anchorage, AK (see 50 CFR 2.2), or by contacting the manager of the respective individual refuge.

## 50 C.F.R. § 36.32. Taking of fish and wildlife.

(a) The taking of fish and wildlife for sport hunting, trapping, and sport fishing is authorized in accordance with applicable State and Federal law and such laws are hereby adopted and made a part of these regulations; Provided however, That the Refuge Manager, pursuant to § 36.42, may designate areas where, and establish periods when, no taking of a particular population of fish or wildlife shall be permitted.

A-8

**50 C.F.R. § 36.42. Public participation and closure procedures.**

(a) Authority. The Refuge Manager may close an area or restrict an activity on an emergency, temporary, or permanent basis.

(b) Criteria. In determining whether to close an area or restrict an activity otherwise allowed, the Refuge Manager shall be guided by factors such as public health and safety, resource protection, protection of cultural or scientific values, subsistence uses, endangered or threatened species conservation, and other management considerations necessary to ensure that the activity or area is being managed in a manner compatible with the purposes for which the Alaska National Wildlife Refuge area was established.